CITY OF SAUSALITO, Plaintiff,

v.

Brian O'NEILL, et al., Defendants.

No. C–01–01819 EDL.

United States District Court,
N.D. California.

July 3, 2002.

Richard R. Jacobs, Howard Rice Nemerovski Canady Falk et al., San Francisco, CA, for Bay Area Discovery Museum.

Charles O'Connor, Chief, Env. & Nat. Resources, San Francisco, CA, for Nation-

al Park Service, Brian O'Neill, John Reynolds.

Linda Parker, Eileen M. Rice, Stephan C. Volker, Law Offices of Stephan C. Volker, Oakland, CA, for City of Sausalito,

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING. PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

LAPORTE, United States Magistrate Judge.

## I. INTRODUCTION

In October 1999, Defendant. National Park Service issued the Final Environmental Impact Statement addressing the plan for the future use of Fort Baker. A former military base, Fort Baker is situated a few miles to the south and west of the City of Sausalito, California, near the north end of the Golden Gate Bridge. The Final Environmental Impact Statement focuses on new uses for historic buildings at Fort Baker, expansion of the Bay Area Discovery Museum, visitor recreation and the protection, restoration and maintenance of natural areas.

On May 10, 2001, Plaintiff City of Sausalito filed this action, concerned that the plan selected would entail excessive development, including a large hotel and conference center, that would increase traffic and otherwise negatively effect the City. Specifically, the City alleges that the Final Environmental Impact Statement is unlawful and violates the National Environmental Policy Act, 42 U.S.C. §§ 4321–4347, the Endangered Species Act, 16 U.S.C. §§ 1531–1544, the Migratory Bird Treaty Act, 16 U.S.C. §§ 703–712, the Marine Mammal Protection Act, 16 U.S.C. §§ 1371–1421h, the Coastal Zone Management Act, 16 U.S.C. §§ 1452–1465, the National Park Service Organic Act, 16 U.S.C.

§§ 1–18f–3, the legislation creating the Golden Gate National Recreation Area, 16 U.S.C. § 460bb, the National Park Service Regulations, 36 C.F.R. Part 51, the 1996 Omnibus Parks and Public Lands Management Act, 16 U.S.C. § 17o, and the Administrative Procedure Act, 5 U.S.C. §§ 701–706.

In October 2001, the National Park Service lodged the voluminous administrative record in this case, totaling 18,665 pages. On March 27, 2002, both parties moved for summary judgment. Both motions were timely opposed and each party filed a reply. Amicus curiae Bay Area Discovery Museum filed a brief on April 24, 2002. On June 5, 2002, the Court held a hearing on the motions for summary judgment. All parties appeared through their counsel of record. The parties submitted supplemental briefing and declarations on June 10, 11 and 13, 2002.

For the reasons explained in detail below, the Court concludes that under the applicable statutes and caselaw, Defendants are entitled to summary judgment. The Court appreciates Sausalito's concerns regarding development and use of this beautiful site, and the potential impact on the quality of life in Sausalito, a charming seaside town. The Court notes that Sausalito's participation in the process of the drafting of the Final Environmental Impact Statement had a positive effect in terms of development of a series of mitigation measures designed to minimize any negative spillover effects on Sausalito. It appears that the National Park Service also took into account Sausalito's concerns when it selected the most environmentally sensitive proposal for the smallest hotel and conference center, with only 156 rooms, as opposed to the much larger 350-room maximum considered in the Plan. This more modest hotel will better maintain the peaceful atmosphere at Fort Bak-

er, while reducing the impact on City traffic. In any event, the Court's task is not to assess the wisdom of the Final Environmental Impact Statement, but only to determine whether it meets the legal requirements that Sausalito has standing to assert. The Court concludes that it does.

## II. BACKGROUND FACTS

Fort Baker is a 335–acre former military site within the boundaries of the Golden Gate National Recreation Area, a unit of the National Park Service. Administrative Record ("AR"), vol. 3 at FB001210. Situated north of the Golden Gate Bridge, Fort Baker is a "bowl-shaped valley" in Marin County, bounded by Highway 101 on the west, by Alexander Avenue on the north and by the San Francisco Bay in Marin County on the south and east. *Id.*

In 1985, the Army began the transfer of land in Fort Baker to the National Park Service. AR, vol. 3 at FB001210. In 1995, Fort Baker was added to the Department of Defense's base closure list. *Id.* Upon base closure in 2001, jurisdiction over the base was completely transferred to the National Park Service. *Id.* Fort Baker contains old military buildings as well as a marina and beach at Horseshoe Bay. AR, vol. 3 at FB001267–FB001268. Fort Baker is an historic district on the National Register of Historic Places. AR, vol. 3 at FB001215. Since 1991, Fort Baker has also been home to the Bay Area Discovery Museum, a popular children's museum. *Id.; see also* Bay Area Discovery Museum Amicus brief at 1:16–25.

### A. Public scoping

Prior to acceptance of the Final Environmental Impact Statement for development at Fort Baker, the National Park Service initiated public scoping, including public meetings, workshops and site tours, beginning in 1997. AR, vol. 1 at FB000049–FB000138. In August 1997, the National Park Service published a Notice of Scoping in the Federal Register, giving the public sixty days to submit comments. AR, vol. 1 at FB000168. Two meetings were held in the fall of 1997 regarding this scoping. AR, vol. 1 at FB000228–000250; FB000257–000303.

As a result of this scoping period, the National Park Service drafted the Draft Environmental Impact Statement. AR, vol. 2 at FB000742–FB000981. After the National Park Service released the Draft Environmental Impact Statement in October 1998, the National Park Service conducted another sixty-day scoping period, during which the National Park Service took 127 oral and written comments and held a public meeting. AR, vol. 2 at FB000982–FB001055; AR, vol. 3 at FB001476–FB001859. The review period ended on December 7, 1998. AR, vol. 2 at FB000711. At the City's request, the National Park Service agreed to three additional public meetings beyond the sixty-day scoping period regarding the City's concerns with the Draft Environmental Impact Statement. AR, vol. 3 at FB001415; AR, vol. 24 at FB015323; AR, vol. 16 at FB011585–011590; AR, vol. 24 at FB015604–015624; AR, vol. 3 at FB001415; *see also* Def.'s Mot. for Summ. J. at 7:6–16. The National Park Service revised the Draft Environmental Impact Statement based on the City's comments during that period as well as on the previous comments, and issued the Final Environmental Impact Statement in October 1999. AR, vol. 3 at FB001196; FB001218; FB001357–FB001359; FB001514–FB001523.

### B. The Final Environmental Impact Statement

The Final Environmental Impact Statement analyzes the environmental conse-

quences of four alternatives for Fort Baker and identifies mitigating measures that would avoid or minimize adverse effects of each alternative. AR, vol. 3 at FB001199. The four alternatives are: (1) the Proposed Action; (2) the 1980 General Management Plan alternative; (3) the Office and Cultural Center alternative; and (4) the No Action alternative. AR, vol. 3 at FB001200–FB001203 (summary of alternatives). The objectives of the Proposed Action, as adopted by the National Park Service, are: (1) to promote the national park mission through providing public programs and opportunities that have a direct relationship with the National Park mission as well as relevance to national and local visitors, protecting, restoring and maintaining historic, cultural and natural resources, and providing opportunities for education and interpretation to a diverse public constituency; (2) to achieve environmental sustainability in buildings and infrastructure as well as financial sustainability by generating "a stable source of revenue that contributes to historic, cultural and natural resource preservation and interpretation including overall site and infrastructure costs;" (3) to retain and relate to Fort Baker's special qualities by demonstrating a relationship between the site and use, by providing waterfront access and by demonstrating a compelling reason for a program's location at Fort Baker; (4) to promote public access by providing for Park user diversity, by providing program diversity and by promoting public access to building and programmatic uses; (5) to minimize environmental impacts by minimizing impacts to the site and adjacent communities, impacts to other Park sites and impacts to traffic and parking; (6) to retain and complement permanent site tenants and other Golden Gate National Recreation Area sites and programs by ensuring compatibility with existing permanent tenants and programs at Fort Baker. AR, vol. 3 at FB001216–FB001218.

Under the Proposed Action, the Bay Area Discovery Museum will expand within its existing structure (10,000 square feet) and will engage in new construction (25,000 square feet). AR, vol. 3 at FB001224; FB001232. The current Bay Area Discovery Museum parking spaces will be relocated to provide the necessary 240 spaces. AR, vol. 3 at FB001224; FB001232.

There will be 42 acres of habitat restoration and enhancement, including additional acres for habitat for the endangered mission blue butterfly. AR, vol. 3 at FB001225. The Proposed Action will maintain and enhance approximately 14.25 acres of existing mission blue butterfly habitat and actively restore another 8.75 acres. AR, vol. 3 at FB001238. The Proposed Action contemplates removal of eucalyptus trees, which are not native plants, but any such removal would be subject to another environmental study and is not part of this Final Environmental Impact Statement. AR, vol. 3 at FB001238.

The total parking spaces at Fort Baker will increase from the current 818 to 895 under the Proposed Action. AR, vol. 3 at FB001226. Total parking for the conference center and retreat would be 455 spaces. AR, vol. 3 at FB001231. The peak daily visitation level will increase from 1,500 to 2,700. AR, vol. 3 at FB001226.

Total net new construction will be 85,000 square feet. AR, vol. 3 at FB001226; FB001375. A conference and retreat center would be the focus of the new construction and some building removal. *Id.* at FB001227. Counsel for the National Park Service confirmed at the June 5, 2002 hearing that the National Park Service has selected a proposal for the hotel and con-

ference center that contains only 156 rooms. June 5, 2002 Hearing Transcript ("Tr.") at 5:6–12. Although neither party is currently bound to complete the development of the 156–room hotel and conference center, the National Park Service told the Court that it intends to follow through with the chosen development plan. Tr. at 5:23–25. Many of the programs hosted by the conference center would be at below-market rates to attract nonprofit and public agencies. AR, vol. 3 at FB001231.

### C. Mitigation measures

The Final Environmental Impact Statement concedes that the Proposed Action would result in a few unavoidable adverse environmental effects, and for that reason contains numerous mitigation measures, several of which are relevant here. First, to minimize the impact on fish and pursuant to the recommendation of the National Marine Fisheries Service, the National Park Service agreed to limit necessary dredging operations at the waterfront to the months of June through September. AR, vol. 3 at FB001246; FB001337. The dredging activities would take place with close supervision of the relevant agencies and pursuant to the resource protection requirements of those agencies. AR, vol.3 at FB001245.

Second, to protect biological resources in general, the National Park Service agreed to control visitor use by closing trails through sensitive areas, by erecting protective barrier fencing, by posting enforcement signing, and by implementing educational programs and materials. AR, vol. 3 at FB001246; see also AR, vol. 3 at FB001278–FB001279; FB001333–FB001334. The National Park Service incorporated a number of specific mitigation measures for the mission blue butterfly, consistent with the United States Fish and Wildlife Service's findings in its Biological Opinion. AR, vol. 4 at FB002343–FB002355. The National Park Service would erect barrier fencing and implement a buffer zone around the mission blue butterfly habitat. AR, vol. 3 at FB001246. Trails through mission blue butterfly habitat would be closed and new trails would be constructed to avoid the habitat. Id. The National Park Service would carry out a protocol for monitoring visitor-associated impacts on the mission blue butterfly and its host plants, including unauthorized trail formation. AR, vol. 3 at FB001247. Habitats not specific to the mission blue butterfly would be monitored for any establishment of mission blue butterfly populations. Id. The National Park Service would annually publish the results of the monitoring to the United States Fish and Wildlife Service. Id.

Further, when construction takes place near the habitat of any species of special concern, including the mission blue butterfly, a qualified biologist would be on hand to ensure that protective measures are implemented and to stop construction if necessary to protect biological resources. Id. To avoid accidental habitat degradation during construction, the National Park Service will create minimum buffer zones of fifty feet around sensitive areas, mark mission blue butterfly host plants in the area of construction, install temporary fencing to control dust during construction, educate workers and enforce a twenty mile per hour speed limit for construction vehicles on streets through the mission blue butterfly habitat. Id. The National Park Service will train workers and volunteers to detect butterfly poachers and will implement poacher patrols. Id. The National Park Service will clear mission blue butterfly habitats of invasive plants and trees that are blocking the habitat. Id. Before January 1, 2005, the National Park Service will review the Fort Baker Plan, including the mission blue butterfly mitigation mea-

sures, with United States Fish and Wildlife Service to determine if the Plan is successful in minimizing harm to the mission blue butterfly. AR, vol. 3 at FB001248.

To minimize the effect on migratory birds, the National Park Service will restrict the timing of tree and vegetation removal and will search for active nests before removal in accordance with park guidelines for protection of nesting birds. AR, vol. 3 at FB001248; *see also* AR, vol. 3 at FB001279; FB001336–FB001337. Also, the National Park Service will maintain mowed areas at a low height to discourage nesting. AR, vol. 3 at FB001248. The National Park Service will also consider use of temporary netting to protect birds during construction. *Id.*

To minimize the effect on marine mammals, the National Park Service will provide signing for the public to prevent disturbance of marine mammals and would limit areas of use for boaters. AR, vol. 3 at FB001249; *see also* AR, vol. 3 at FB001279; FB001336–FB001337. The National Park Service will also conduct ongoing monitoring of marine mammals. AR, vol. 3 at FB001249.

Third, and of particular relevance to Sausalito, the Final Environmental Impact Statement contains numerous mitigation measures directed at traffic. AR, vol. 3 at FB001251–FB001256; *see also* AR, vol. 3 at FB001283–FB001291. The National Park Service will increase signage and will direct visitors to certain highway exits to minimize traffic congestion. AR, vol.3 at FB001251. Some roads will be widened. *Id.* The National Park Service will employ off-site parking, shuttle services and "traffic calming" features. AR, vol. 3 at FB001251–FB001252. A Transportation Demand Management Program and a Transportation Systems Management Program will be implemented. AR, vol. 3 at FB001252–FB001254. Also, the National Park Service will monitor traffic. AR, vol. 3 at FB001255.

At the request of the City, the National Park Service specifically analyzed traffic effects on downtown Sausalito. AR, vol. 3 at FB001357–FB001365. The National Park Service found that, in a worst case scenario, the Fort Baker Plan would cause forty-two additional trips through downtown Sausalito during the peak weekend period from 12 noon to 3:00 p.m. AR, vol. 3 at FB001358. The National Park Service estimates that this number would be reduced by 5–10% after mitigation measures, such as shuttle service, ridesharing programs, education about traffic congestion and closure of certain main roads, were implemented. AR, vol. 3 at FB001359. The National Park Service concluded that Sausalito would experience a small increase in traffic, but the currently existing congestion in downtown Sausalito would occur even without the Proposed Action. AR, vol. 3 at FB001364–FB001365; FB001410–FB001411.

### D. Rejected alternatives

The Final Environmental Impact Statement specifically rejects several alternatives that were initially thought to be viable or were suggested by the public. AR, vol. 3 at FB001259–FB001261. Specifically, the National Park Service rejected the Maximum Natural Resource Restoration alternative, which was similar to the Proposed Action, but which would have maximized restoration of a twelve-acre marsh with wetlands and streams. AR, vol. 3 at FB001259. In rejecting this alternative, the National Park Service concluded that the small size of the wetland area was marginal for a successful project, and that the wetland restoration was not compatible with anticipated public uses as well as access requirements and would result in

higher costs or would divert costs from other .wetland restoration projects. AR, vol. 3 at FB001260. More importantly, restoration would be in conflict with objectives requiring preservation of cultural resources and would adversely impact the historic landscape, including the Parade Ground. *Id.*

### E. Cumulative impacts

The Final Environmental Impact Statement also examines the cumulative impacts of the Proposed Action in accordance with the requirements of the National Environmental Policy Act. AR, vol. 3 at FB001307–FB001390. Based on scientific information, the National Park Service found that the environmental impacts after the mitigation measures as discussed above were carried out would be less than significant or even beneficial. AR, vol. 3 at FB001310–FB001316 (summary of environmental impacts after mitigation). With respect to biological resources, the National Park Service engaged in extensive discussions with the Fish and Wildlife Service and the National Marine Fisheries Service and both agencies signed off on the Proposed Action. AR, vol. 4 at FB002313–FB002389; FB002293–FB002312. The Fish and Wildlife Service issued a Biological Opinion stating that the Proposed Action would not likely to jeopardize the continued existence of the mission blue butterfly. AR, vol. 4 at FB002350.

### F. Record of Decision

In June 2000, the National Park Service issued its Record of Decision, which formally adopted the Proposed Action and all the mitigation measures. AR, vol. 3 at FB001873–FB001973. The Record of Decision states that the Proposed Action was selected because of its "ability to successfully fulfill the goals and objectives of the project. The Proposed Action provides the most desirable combination of promoting the National Park mission and public use, while preserving the site's resources and contemplative atmosphere and minimizing environmental effects including traffic." AR, vol. 3 at FB001872A.

The National Park Service has issued a notice of intent to begin construction on June 15, 2002 at Fort Baker pursuant to the Final Environmental Impact Statement.

### III. LEGAL STANDARD ON SUMMARY JUDGMENT

Rule 56(c) of the Federal Rule of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). Material facts are those that may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See id.* The court may not weigh the evidence. *See id.* at 255, 106 S.Ct. 2505. Rather, the nonmoving party's evidence must be believed and "all justifiable inferences must be drawn in [the nonmovant's] favor." *United ed Steelworkers of Am. v. Phelps Dodge Corp.,* 865 F.2d 1539, 1542 (9th Cir.1989) (en banc) (citing *Liberty Lobby,* 477 U.S. at 255, 106 S.Ct. 2505).

The moving party bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the pleadings, depositions, interrogatory answers, admissions and affidavits, if any, that it believes dem-

onstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Where the nonmoving party will bear the burden of proof at trial, the moving party's burden is discharged when it shows the court that there is an absence of evidence to support the nonmoving party's case. *See id.* at 325, 106 S.Ct. 2548.

A party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of [that] party's pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *Liberty Lobby*, 477 U.S. at 250, 106 S.Ct. 2505. The opposing party, however, need not produce evidence in a form that would be admissible at trial in order to avoid a summary judgment. *See Celotex*, 477 U.S. at 324, 106 S.Ct. 2548. Nor must the opposing party show that the issue will be resolved conclusively in its favor. *See Liberty Lobby*, 477 U.S. at 248–49, 106 S.Ct. 2505. All that is necessary is sufficient evidence supporting the asserted factual dispute and requiring a jury or judge to resolve the parties' differing versions of the truth at trial. *See id.*

## IV. STANDING

### A. Constitutional Standing

To proceed with this action, the City must show both constitutional standing and prudential standing. Under Article III, constitutional standing requires: (1) an injury in fact, which is both concrete and particularized, and actual or imminent, not merely conjectural or hypothetical; (2) a causal connection between the injury and the conduct complained of; and (3) a likelihood that the injury can be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). In opposition to a summary judgment motion, a plaintiff must " 'set forth' by affidavit or other evidence 'specific facts' " showing constitutional standing. *Id.* at 561, 112 S.Ct. 2130; Fed. R. Civ. Proc. 56(e). Where, as here, the plaintiff is not the object of the government action or inaction, "standing is not precluded, but it is ordinarily 'substantially more difficult' to establish." *Lujan*, 504 U.S. at 561, 112 S.Ct. 2130.

While the National Park Service is correct that the City may not assert *parens patriae* standing to sue on behalf of its citizens, the City may sue to vindicate its own proprietary interests. *See Alfred L. Snapp & Son v. Puerto Rico*, 458 U.S. 592, 600–01, 102 S.Ct. 3260, 73 L.Ed.2d 995 (1982) (holding that a State may bring a *parens patriae* action on behalf of its citizens and will have constitutional standing if the State asserts an injury to one of its quasi-sovereign interests); *Colorado River Indian Tribes v. Town of Parker*, 776 F.2d 846, 848 (9th Cir.1985) (finding that municipalities do not have *parens patriae* standing because their power is derivative and not sovereign, but that municipalities may "sue to vindicate such of their own proprietary interests as might be congruent with the interests of their inhabitants").

The National Park Service argues that the City has failed to set forth any proprietary interests, separate from those of its citizens, that satisfy the injury in fact prong of the constitutional standing requirements. Plaintiff improperly relies on *Fireman's Fund Ins. Co. v. City of Lodi*, 271 F.3d 911, 938 (9th Cir.2001) for its argument that a city has standing to protect from damage its proprietary interests in its natural resources. Putting aside its very different facts, that case was withdrawn by the Ninth Circuit and may not be cited to this Court. *Fireman's Fund Ins. Co. v. City of Lodi*, 287 F.3d 810 (9th

Cir.2002). Nonetheless, the City has shown through the declaration of Dana Whitson, its City Manager, that the Fort Baker Plan would result in a detrimental increase in traffic and crowds in downtown Sausalito, affecting City-owned streets as well as municipal management and public safety functions.[1] Declaration of Dana Whitson ("Whitson Decl.") at ¶ 7. Therefore, the City has shown an injury in fact. The increased traffic is an actual injury as evidenced by the Fort Baker Plan itself, which states that during peak weekend hours, the Fort Baker Plan would cause approximately forty-two additional trips through downtown Sausalito. AR, vol. 3 at FB001358. The City's injury could be redressed by a favorable decision in this case. Thus, the City has constitutional standing to bring this action.

## B. Prudential Standing

Even if a plaintiff falls within the constitutional boundaries, a plaintiff may still lack standing under judicially-imposed prudential principles. *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 99–100, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979). Where there is no private right of action under a statute, the Administrative Proce-

dure Act is the only avenue for challenging the legality of federal actions. *Clouser v. Espy,* 42 F.3d 1522, 1528, n. 5 (9th Cir. 1994). The prudential standing requirement under the Administrative Procedure Act requires that "the interest that plaintiff seeks to protect must be arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *National Credit Union Admin. v. First National Bank & Trust Co.,* 522 U.S. 479, 488, 118 S.Ct. 927, 140 L.Ed.2d 1 (1998). In determining whether a plaintiff's interest is protected within the meaning of the zone of interest test, a court must examine the particular provision of law upon which the plaintiff relies, not the overall purpose of the Act in question. *Bennett v. Spear,* 520 U.S. 154, 175, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997).

The National Park Service contends that the City has not shown prudential standing under the applicable National Park Service Regulations, the 1996 Omnibus Parks and Public Lands Management Act, the Coastal Zone Management Act, the Migratory Bird Treaty Act or the Marine Mammal Protection Act. There is no private right of

1. After the National Park Service moved to strike the declaration of Dana Whitson, the City submitted a supplemental declaration from Ms. Whitson to support her original statements. The Court considered the supplemental declaration in conjunction with her original declaration in making the following ruling regarding the admissibility of the original Whitson declaration. Paragraph two is admissible with the exception of the portion of the last sentence stating, "... and wildlife habitat and declining species diversity and abundance." Paragraph three is admissible. Paragraph four is admissible, although as the City acknowledged at the hearing, it misstates the level of traffic increase: the Fort Baker Plan contemplates a *peak* visitor level of 2,700 people, rather than a *daily* visitor rate of 2,700 as stated in Ms. Whitson's declaration. AR, vol. 3 at FB001226. Paragraph five is admissible with the exception that Ms. Whitson is not competent to testify that migratory birds and marine mammals "would decline in numbers and possibly disappear from the area altogether due to their being displaced from Horseshoe Bay and Fort Baker." Paragraph six is inadmissible to the extent that Ms. Whitson has not shown that the Fort Baker Plan will eliminate designated restoration habitat for the mission blue butterfly or will harm salmon in Sausalito. Paragraph seven is admissible to the extent that Ms. Whitson is competent to testify about the increased traffic in Sausalito due to the implementation of the Fort Baker Plan. The Final Environmental Impact Statement states that traffic will increase in downtown Sausalito as a result of the Plan. AR, vol. 3, FB001358–FB001359. Paragraph eight is inadmissible.

action under these Acts and Regulations, so review is governed by the Administrative Procedure Act. Because the National Park Service does not challenge the City's prudential standing under the National Environmental Policy Act, the Endangered Species Act and the National Park Service Organic Act, any objection to nonconstitutional standing under these three Acts is waived. *See Pershing Park Villas Homeowners Ass'n v. United Pac. Ins. Co.*, 219 F.3d 895, 899 (9th Cir.2000).

### 1. Coastal Zone Management Act

■ The Coastal Zone Management Act seeks to protect and enhance the coastal zone through a cooperative state and federal effort. 16 U.S.C. § 1452. California developed the Bay Conservation and Development Commission to oversee and limit development in the San Francisco Bay. Cal. Gov't Code § 66600, *et seq.* Under the Coastal Zone Management Act, a federal agency undertaking any development project within a coastal zone must insure that the project is, "to the maximum extent practicable," consistent with the policies of the State-approved management plan, here, the Bay Conservation and Development Commission Bay plan. 16 U.S.C. § 1456(c)(1). To meet this requirement, the federal agency and the state agency participate in a consistency determination. There is no provision for participation by local governments. In this case, Bay Conservation and Development Commission issued a "Letter of Agreement" with the National Park Service's consistency determination, stating that the Fort Baker Plan was consistent with the Bay Conservation and Development Commission's policies. AR, vol. 4 at FB002391. Through this process, the National Park Service complied with the Coastal Zone Management Act procedure.

The zone of interests regulated by the Coastal Zone Management Act extends to a state's protection of their coastal zones, but not to a local entity's quarrel with the state agency's conclusion that the proposed action is consistent with the Coastal Zone Management Act. *See Serrano–Lopez v. Cooper,* 193 F.Supp.2d 424, 434 (D.P.R.2002). Where, as here, a plaintiff's claim under the Coastal Zone Management Act focuses on the consistency determination, the "only party that could potentially bring its concerns, interest and potential injuries within the zone of interests of the [Coastal Zone Management Act]" is the approved State management program, in this case the Bay Conservation and Development Commission. *Id.* The Act does not provide for "local entities ... to substitute their own interests and judgment for that of the reviewing state agency." *Id.*

Here, prior to the completion of the Final Environmental Impact Statement, the National Park Service complied with the Coastal Zone Management Act requirements by consulting with the Bay Conservation and Development Commission regarding the effect of the Fort Baker Plan on the Commission's San Francisco Bay Plan. The Commission issued a consistency determination, finding that the Fort Baker Plan was consistent with the San Francisco Bay Plan. The City lacks prudential standing to challenge the state's consistency determination. In any case, courts will not overturn a consistency finding by the responsible state agency in concurrence with the responsible federal agency, absent a compelling reason, which the City has not supplied. *Akiak Native Community v. U.S. Postal Serv.,* 213 F.3d 1140, 1146–47 (9th Cir.2000) (refusing to set aside a consistency determination reached between the responsible Alaska agency and the Postal Service absent a compelling reason, which the plaintiffs had failed to present).

## 2. Marine Mammal Protection Act

█ The Marine Mammal Protection Act prohibits "taking" a marine mammal without a permit. 16 U.S.C. § 1371(a)(3). "Take" is defined as "to harass, hunt, capture, collect, or kill, or attempt to harass, hunt, capture, collect or kill, any marine mammal." 50 C.F.R. 216.3. A taking requires a "direct, serious disruption" of a marine mammal's customary behavior in the context of criminal liability for violation of the Act. *United States v. Hayashi*, 22 F.3d 859, 865–66 (9th Cir.1993) (finding that a defendant who fired his rifle into the water behind some porpoises did not harass the porpoises within the meaning of the Marine Mammal Protection Act because his act did not result in a "severe disruption of the mammal's normal routine").

The primary purpose and, therefore, the zone of interests of the Marine Mammal Protection Act is maintenance of the health and stability of the marine mammal population and its supporting ecosystem. *See Kanoa, Inc. v. Clinton*, 1 F.Supp.2d 1088, 1094 (D.Haw.1998). The Marine Mammal Protection Act was not enacted to address economic interests. *Id.*

Here, the City has made no showing that any taking of marine mammals has occurred or will occur as a result of the Fort Baker Plan. Indeed, the Fort Baker Plan states that although construction activities "could temporarily disrupt all marine mammals … in proximity to work sites," there would be "no long-term adverse impact on marine species due to construction activities." AR, vol. 3 at FB001336. The Final Environmental Impact Statement provides for many mitigation measures to protect marine mammals, including use of signs, limitations on the use of the waterfront and ongoing monitoring. AR, vol. 3 at FB001249; FB001336.

Moreover, even if the City could show a taking of marine mammals, the City has only claimed harm to its economic interests, such as a decline in the tourism industry and a decrease in sales tax revenues. These economic interests are not within the zone of interests of the Marine Mammal Protection Act. The City's attempt at oral argument to convert these interests into non-economic interests by focusing on potential secondary effects of the loss of revenues on the City's operations proves too much, since economic harm virtually always causes non-economic secondary effects. *See* Tr. 32:16–33:16. Therefore, the City has no prudential standing under the Administrative Procedure Act for a violation of the Marine Mammal Protection Act.

## 3. Migratory Bird Treaty Act

█ The purpose of the Migratory Bird Treaty Act is to "aid in the restoration of such birds in those parts of the United States adapted thereto where the same have become scarce or extinct, and also to regulate the introduction of American or foreign birds or animals in localities where they have not heretofore existed." 16 U.S.C. § 701. Under the Act, in the absence of a permit, it "shall be unlawful at any time, by any means or in any manner, to pursue, hunt, take, capture, kill, attempt to take, capture or kill, … any migratory bird, any part, nest, or egg of any such bird…." 16 U.S.C. § 703. The Migratory Bird Treaty Act is similar to the Marine Mammal Protection Act in that it targets protection of wildlife. Therefore, the zone of interests for the Migratory Bird Treaty Act is restoration and protection of scarce or extinct migratory birds.

Although the City has pointed to evidence in the Administrative Record that migratory birds live in Sausalito (AR, vol. 6 at FB003964–FB003965; FB004222), the

City has not demonstrated that migratory birds will be displaced or will perish in Sausalito as a result of the Fort Baker Plan. The Final Environmental Impact Statement contains numerous mitigation measures designed to protect migratory birds in Fort Baker, including buffer zones, observation of birds before and during construction, presence of a qualified biologist who will check for nesting activity, use of signs, implementation of a monitoring program, establishment of contingency plans and temporary netting for bird exclusion. AR, vol. 3 at FB001248. The City has not shown that those measures are inadequate to protect birds in Sausalito. Moreover, the City raises only economic and quality of life interests, such as decreasing sales tax revenues and declining attractiveness of the shoreline, which are not within the zone of interests of the Migratory Bird Treaty Act. Therefore, the City has no prudential standing under the Administrative Procedure Act for a violation of the Migratory Bird Treaty Act.

### 4. Park Service Regulations

■ The Park Service regulation at issue states, in relevant part

It is the policy of the Congress and the Secretary that visitor services in park areas may be provided only under carefully controlled safeguards against unregulated and indiscriminate use so that visitation will not unduly impair park value and resources. Development of visitor services in park areas will be limited to locations that are consistent to the highest practicable degree with the preservation and conservation of the resources and values of the park area. It is also the policy of the Congress and the Secretary of the Interior that development of visitor services in park areas must be limited to those as are necessary and appropriate for public use and

enjoyment of the park area in which they are located.

36 C.F.R. § 51.2. The City claims that the Fort Baker Plan constitutes a "huge commercial enterprise," which would permanently impair Fort Baker's resources in violation of this Regulation.

This Regulation is part of a larger regulatory scheme under which concession contracts and permits may be issued on federal lands. 36 C.F.R. Part 51. The particular Regulation at issue here is the policy statement behind Part 51, which operates in conjunction with the Concessions Policy Act, under which the government has discretion to select concessionaires for federal parks. The zone of interests is protection of federal lands against excessive or destructive concession uses. The City is not within the zone of interests because it is neither federal land nor an actual or would-be concessionaire. Nor does the City claim an interest in any concessionaires at Fort Baker. Therefore, the City does not have prudential standing under the Administrative Procedure Act for violation of this National Park Service Regulation.

### 5. 1996 Omnibus Parks and Public Lands Management Act

■ The Omnibus Act, which provides for employee housing on federal land, states, in relevant part, that one of the purposes of the Act is "to rely on the private sector to finance or supply housing in carrying out this section, to the maximum extent possible, in order to reduce the need for Federal appropriations." 16 U.S.C. § 17o(1)(C). The Act authorizes the National Park Service, where "necessary and justified," to make available employee housing on federal lands to National Park Service employees. 16 U.S.C. § 17o(2). Further, the Act states, "the Sec-

retary may not utilize any lands for the purposes of providing field employee housing under this section which will impact primary resource values of the area or adversely affect the mission of the agency." 16 U.S.C. § 17o(17)(A). Examination of the Act's five purposes reveals that is aimed at developing new governmental housing, repairing old housing and eliminating unnecessary housing, all while avoiding impacts on primary resources and ensuring that adequate funding is available. 16 U.S.C. § 17o(1)(A)-(E). Therefore, the zone of interests includes protection of federal lands against excessive housing that would degrade natural resources while reducing the need for federal funding.

The City's concerns that allowing employees to live at Fort Baker will impact primary resource values of the area, will tax the City's resources because the City will have to provide services and will increase use of the City's streets, sidewalks and other public improvements are unsupported by the record. Further, these interests are not within the zone of interests of the Omnibus Act. The City does not have prudential standing under the Administrative Procedure Act for violation of the Omnibus Act.

### C. Conclusion as to Standing

Although the City has shown an injury in fact sufficient to satisfy the requirements of Article III, the City has failed to show prudential standing with regard to the Coastal Zone Management Act, the Marine Mammal Protection Act, the Migratory Bird Treaty Act, the Park Service Regulations and the Omnibus Act. Summary Judgment is therefore granted in favor of the National Park Service on those claims. Plaintiff may proceed on its claims under the National Environmental Policy Act, Endangered Species Act and the National Park Service Organic Act.

### V. NATIONAL ENVIRONMENTAL POLICY ACT

The National Environmental Policy Act was enacted in part to declare a national policy of encouraging productive and enjoyable harmony between man and the environment, and to prevent or eliminate damage to the environment. 42 U.S.C. § 4321. One of the responsibilities of the Federal government under the National Environmental Policy Act is to "preserve important historic, cultural, and natural aspects of the national heritage, and maintain, wherever possible, an environment which supports diversity and variety of individual choice...." 42 U.S.C. § 4331(b)(4).

The National Environmental Policy Act provides that a detailed environmental impact statement shall be prepared for "major Federal actions significantly affecting the quality of the human environment...." 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1508.11. The purpose of an environmental impact statement is to provide full and fair discussion of significant environmental impacts and to inform decision makers and the public of reasonable alternatives which would minimize adverse impact to the environment 40 C.F.R. § 1502.1. The environmental impact statement must discuss: (1) the environmental impact of the proposed action; (2) any adverse environmental effects which cannot be avoided should the proposal be implemented; (3) alternatives to the proposed action; (4) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity; and (5) any irreversible and irretrievable commitments of resources which would be involved in the

proposed action should it be implemented. 42 U.S.C. § 4332(2)(C).

The National Environmental Policy Act does not contain a separate provision for judicial review. Therefore, an agency's compliance with the National Environmental Policy Act is reviewed under the Administrative Procedure Act, which requires a determination of whether the agency's final action was "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law." *Okanogan Highlands Alliance v. Williams,* 236 F.3d 468, 471 (9th Cir.2000); *City of Carmel–By–The–Sea v. U.S. Dep.'t of Transportation,* 123 F.3d 1142, 1150 (9th Cir.1997) ("... we defer to agency opinion if it is not otherwise shown to be arbitrary and capricious."); *Western Radio Servs. Co., Inc. v. Espy,* 79 F.3d 896, 900 (9th Cir.1996) ("We may reverse the agency's decision as arbitrary and capricious if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, offered an explanation that ran counter to the evidence before the agency, or offered one that is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.").

When examining the adequacy of an environmental impact statement under the Administrative Procedure Act, courts apply a "rule of reason" standard which asks " 'whether an environmental impact statement contains a reasonably thorough discussion of the significant aspects of the probable environmental consequences.' " *Churchill County v. Norton,* 276 F.3d 1060, 1071 (9th Cir.2001) (quoting *Trout Unlimited v. Morton,* 509 F.2d 1276, 1283 (9th Cir.1974)); *see also City of Carmel,* 123 F.3d at 1150–51 ("... the National Environmental Policy Act requires a 'reasonably thorough' discussion of the environmental consequences in question, not

unanimity of opinion, expert or otherwise."). In making this determination, a court must make a " 'pragmatic judgment whether the environmental impact statement's form, content, and preparation foster both informed decision-making and informed public participation.' " *Churchill County,* 276 F.3d at 1071; *City of Carmel,* 123 F.3d at 1150–51. " 'Once satisfied that a proposing agency has taken a "hard look" at a decision's environmental consequences, [our] review is at an end.' " *City of Carmel,* 123 F.3d at 1151 (quoting *Idaho Conservation League v. Mumma,* 956 F.2d 1508, 1519 (9th Cir.1992)).

The City brings several challenges to the Final Environmental Impact Statement under the National Environmental Policy Act: (1) that the Final Environmental Impact Statement fails to consider a reasonable range of alternatives; (2) that the Final Environmental Impact Statement fails to disclose the economic analysis on which it is based; (3) that the Final Environmental Impact Statement fails to consider significant impacts; (4) that the Final Environmental Impact Statement fails to support its conclusions with scientific evidence; (5) that the Final Environmental Impact Statement fails to consider cumulative impacts; and (6) that the Final Environmental Impact Statement fails to adequately disclose biological opinions of the Fish and Wildlife Service and the National Marine Fisheries Service.

**A. Reasonable alternatives**

■ The National Park Service evaluated four alternatives for the reuse of Fort Baker: a No Action alternative (AR at FB001241–1242); the 1980 General Management Plan alternative (AR at FB001238–1240); the Office and Cultural Center alternative (AR at FB001240–FB001241); and the Proposed Action, which includes a Retreat and Conference

Center, expansion of the Bay Area Discovery Museum ("Bay Area Discovery Museum"), conversion of the marina to public use and waterfront and habitat restoration (AR at FB001227–1238). The City, however, contends that all these alternatives include extensive development, and that the National Park Service violated the National Environmental Policy Act by failing to consider a Maximum Natural Resource Restoration alternative that did not require extensive development.

An environmental impact statement must discuss "reasonable alternatives" to the proposed action. 42 U.S.C. § 4332(2)(C)(iii); *City of Carmel*, 123 F.3d at 1155. The "rule of reason" guides the choice of alternatives and the extent to which the Environmental Impact Statement must discuss each alternative. *City of Carmel*, 123 F.3d at 1155 (citing *Citizens Against Burlington v. Busey*, 938 F.2d 190, 195 (D.C.Cir.1991)). "The environmental impact statement need not consider an infinite range of alternatives, only reasonable and feasible ones." *City of Carmel*, 123 F.3d at 1155 (finding that consideration of eight alternatives was reasonable); *see also Laguna Greenbelt, Inc. v. U.S. Dep't of Transportation*, 42 F.3d 517, 524 (9th Cir., 1994); *Seattle Audubon Society v. Moseley*, 80 F.3d 1401, 1404 (9th Cir.1996); 40 C.F.R. § 1502.14(a)-(c). A court should uphold "an agency's definition of objectives so long as the objectives that the agency chooses are reasonable, and we uphold its discussion of alternatives so long as the alternatives are reasonable and the agency discusses them in reasonable detail." *Citizens Against Burlington*, 938 F.2d at 195 (finding that consideration of two alternatives was reasonable); *Morongo Band of Mission Indians v. FAA*, 161 F.3d 569, 575 (9th Cir.1998) ("The 'touchstone for [the court's] inquiry is whether an environmental impact statement's selection and discussion of alternatives fosters

informed decision-making and informed public participation.'") (quoting *City of Angoon v. Hodel*, 803 F.2d 1016, 1020 (9th Cir.1986)).

The range of alternatives that is deemed reasonable derives from the environmental impact statement's Purpose and Need section, which defines "the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action." 40 C.F.R. § 1502.13; *see also City of Carmel*, 123 F.3d at 1155 ("The stated goal of a project necessarily dictates the range of reasonable alternatives and an agency cannot define its objectives in unreasonably narrow terms."). Here, the Final Environmental Impact Statement' Purpose and Need section appropriately provides several objectives that were developed to create a framework for considering and evaluating potential site uses. The objectives address the multiple and, in some instances, competing interests involved in preserving a park situated very close to urban areas, that has been developed historically for military use, and more recently for children's educational use through the Bay Area Discovery Museum, as well as for recreational use.

The objectives chosen include: (1) promoting the National Park Mission, that is, dedication "to conserving unimpaired the natural and cultural resources and values of the National Park System for the enjoyment, education and inspiration of this and future generations," by providing public programs and opportunities, protecting, restoring and maintaining historic, cultural and natural resources, and providing opportunities for education and interpretation to a diverse public constituency; (2) achieving environmental sustainability by promoting environmentally sustainable building, infrastructure, landscape design, programming and operational practices,

including access to and within the site, promoting education, and achieving financial sustainability by generating a stable source of revenue that contributes to historic, cultural and natural resource preservation and interpretation, including overall site and infrastructure costs; (3) retaining and relating to the site's special qualities by demonstrating a relationship between site and use, providing waterfront access and demonstrating a compelling reason for the program's location at Fort Baker; (4) promoting public access by providing for park use diversity, providing program diversity and promoting public access to building and programmatic uses; (5) minimizing environmental impacts by minimizing impacts to the site and adjacent communities, minimizing impacts to other park sites and minimizing traffic and parking impacts; and (6) retaining and complementing permanent site tenants and other GGNRA sites and programs by ensuring compatibility with existing permanent tenants and programs at Fort Baker. AR, vol. 3 at FB001216–1218. Despite the City's argument that these goals are unreasonable, a review of the goals in conjunction with congressional mandates reveals their reasonableness. And these goals in turn support the four alternatives considered in the Final Environmental Impact Statement. There is no magic number of alternatives that must be considered; all that is required is that the agency consider all alternatives reasonably related to the purposes of the project. *Laguna Greenbelt*, 42 F.3d at 524.

The City objects specifically to the financial sustainability goal. This goal is only one among many. Further, contrary to the City's interpretation, complete financial sustainability is not required by the goal. The goal seeks a stable source of revenue to *contribute to* the preservation and site costs. AR, vol. 3 at FB001217. Indeed, in the Omnibus Con-

solidated and Emergency Supplemental Appropriations Act of 1999, Congress authorized the National Park Service to enter into leases at Fort Baker with the proceeds targeted for payment of costs at Fort Baker. *See* AR, vol. 1 at FB000006.

Congress has also spoken on the issue of planning in the Golden Gate National Recreation Act:

In order to preserve for public use and enjoyment certain areas of Marin and San Francisco Counties, California possessing outstanding natural, historic, scenic and recreational values, and in order to provide for the maintenance of needed recreational open space necessary for urban environment and planning, the Golden Gate National Recreation Area is hereby established.... In the management of the recreation area, the Secretary ... shall utilize the resources in a manner which will provide for recreation and educational opportunities consistent with sound principles of land use planning and management. In carrying out the provisions of this subchapter, the Secretary shall preserve the recreation areas, as far as possible, in its natural setting, and protect it from development and uses which would destroy the scenic beauty and natural character of the area.

16 U.S.C. § 460bb. The City focuses on the last principle from this statute to argue that the National Park Service is acting contrary to congressional intent by destroying the scenic beauty and natural character of Fort Baker by developing the site. The statute, however, does not foreclose *all* development, as the City would suggest.

Here, the three action alternatives in the Final Environmental Impact Statement contemplate some level of development in Fort Baker, which is why the City objects

to the alternatives. *See* AR, vol. 3 at FB001224–1226 (summary of alternatives). The Proposed Action does not, however, include the most development. *See* AR, vol. 3 at FB001226 (parking spaces under the Proposed Action will be 895, while the General Management Plan alternative has 1,632 and the Office and Cultural Center alternative has 1,300; the peak daily visitation level under the Proposed Action is 2,700, while under the General Management Plan alternative and the Office and Cultural Center alternative, peak visitation would be 4,000 and 3,500, respectively).

More importantly, Fort Baker already contains a substantial amount of development, including buildings that are designated as historic. AR, vol. 3 at FB001281–1282. Unlike some national parks, Fort Baker is not a pristine wilderness largely untouched by civilization. To the contrary, it contains historic buildings reflecting our cultural history, which have been listed in the National Register of Historic Places, and their preservation is a reasonable goal. The agency must consider both beneficial and adverse impacts, including "[t]he degree to which the action may adversely affect … structures … listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources." 40 C.F.R. § 1508.27(b)(8). In addition, the City ignores the fact that each action alternative also contains substantial natural resource preservation and restoration. AR, vol. 3 at FB001224–1226 (summary of alternatives).

■ The City claims that the National Park Service violated the National Environmental Policy Act by not considering an alternative focused on maximum natural resource restoration. The National Park Service, however, considered but rejected a Maximum Natural Resource Res-

toration alternative, which would have maximized restoration of wetlands and stream courses throughout the site. The National Park Service reasonably rejected this alternative because:

> Although restoration of a seasonal or tidal marsh in the waterfront would be feasible … this concept was not carried forward as a component of the Proposed Action or other alternatives for several reasons. The limited site for wetland restoration was considered marginal for a successful project. A wetland restoration in the small waterfront area was not considered compatible with anticipated public uses and access requirements. Wetland restoration would result in higher site improvement and maintenance costs. National Park Service resources are currently committed to wetland restoration at three priority sites within the park … which required the focus of attention for funding, planning implementation and monitoring over the course of the next 5 to 10 years. *Restoration of stream channels on the site connecting to the bay would be in conflict with the National Park Service objectives to preserve cultural resources and would result in an adverse impact to the historic and cultural landscape including the Parade Ground which is the most significant element.* Although the Proposed Action would not preclude consideration of certain elements of this alternative in the future if conditions, park priorities and funding availability change, such action is considered infeasible at this time.

AR, vol. 3 at FB001260 (emphasis added); *see also* Defs.' Opp'n to Pl.'s Mot. for Summ. J. at 6:9–7:18.

■ The City contends that the National Park Service did not consider this alternative because "the predominant stated goal of the Environmental Impact

Statement is to make Fort Baker financially self-sufficient." Pl.'s Opp'n to Defs.' Mot. for Summ. J. at 15:14–16. This contention ignores the other reasons for rejecting this alternative, including its adverse impact on the historic Parade Ground. Also, financial sustainability is not the predominant goal, nor is complete self-sufficiency the intended result.[2] *See also City of Angoon v. Hodel,* 803 F.2d 1016, 1021 (9th Cir.1986) (accepting the agency's characterization of purpose and need, including cost effective goals).

Finally, the City has failed to meet its burden of showing that the Maximum Natural Resource Restoration alternative or a similar alternative would meet the goals of the Final Environmental Impact Statement. *Morongo Band,* 161 F.3d at 575 (finding that the burden is on the party challenging the agency action to offer feasible alternatives); *City of Angoon,* 803 F.2d at 1022 (finding that the challenger had not "offered a specific, detailed coun-

terproposal that had a chance of success"). In short, the National Park Service's choice of alternatives does not violate the National Environmental Policy Act.

## B. Economic analysis

If a cost-benefit analysis relevant to the choice of alternatives is conducted, the analysis must be incorporated by reference or appended to the statement as an aid in evaluating environmental consequences. 40 C.F.R. § 1502.23. A cost-benefit analysis under this rule can take many varying forms:

> from a formal analysis in which all costs and benefits are quantified in an identical unit of measurement, usually dollars, and compared, to an informal analysis where costs and benefits are identified, quantified if possible, and balanced.... Under the Council of Environmental Quality's regulations governing the implementation of the National Environmental Policy Act, an Environmental

---

2. The City points to various documents in the record that purport to show complete financial self-sufficiency as an overriding goal. *See* Pl.'s Mot. for Summ. J. at 16:11–19:22. In a Fort Baker Study Update from July 1997, the National Park Service states that bringing the site up to code will cost in excess of $30 million. As a result, any alternative would have to be economically viable with a cash flow to support the cost of the improvements. AR, vol. 29 at FB0018581. This document is not inconsistent with the National Park Service's multiple other goals in addition to financial sustainability. Nor does the document state that no alternatives other than cost-effective ones would be considered. Specifically, the report, which was created in the early stages of the National Environmental Policy Act process, says that "it is important to understand the financial feasibility of potential reuse projects before moving too far ahead in the planning process." *Id.* Accordingly, this document does not show that financial self-sufficiency was the primary goal. In November 1997, National Park Service Planner Nancy Horner stated at a meeting that financial sustainability is an important goal

because there will be no public funds for the Fort Baker project to rehabilitate the existing buildings and that the eventual Fort Baker Plan should be able to generate revenue. AR, vol. 1 at FB000268–69. Again, this is not inconsistent with the other goals of the National Park Service and does not necessarily show that financial goals were paramount. The City points to a scoping workshop document stating that several alternatives were dismissed because they did not meet the criteria for new uses. AR, vol. 2 at FB000465. The document, however, does not specifically say that the uses did not meet the financial goals. The City further notes a statement by Ms. Horner that the National Park Service will be counting on the hotel to bring in the financing for rehabilitation of historic buildings. AR, vol. 22 at FB014643. This does not necessarily have the sinister effect that the City contends, that is, that the National Park Service can conceal its actions from Congress. Ms. Horner goes on to state that the National Park Service will also be looking to private philanthropists to support the Fort Baker restoration. *Id.*

Impact Statement need not include a formal cost-benefit analysis and in fact a more informal analysis is preferred 'when there are important qualitative considerations.' 40 C.F.R. § 1502.23. At a minimum, the Environmental Impact Statement 'should at least include those considerations, including factors not related to environmental quality, which are likely to be relevant and important to a decision.' *Id.*

*Sierra Club v. Sigler,* 695 F.2d 957, 976, n. 15 (5th Cir.1983).

■ Here, the National Park Service did not conduct a formal cost-benefit analysis. The City points to several economic analyses that it argues should have been disclosed under this rule. *See* AR, vol. 20 at FB013204 (Sedway Group Market and Economic Assessment of Fort Baker Reuse Opportunities); vol. 20 at FB013284 (Sedway Group pro forma analysis); vol. 20 at FB013355 (Sedway Group pro forma analysis); vol. 20 at FB013317 (Esherick feasibility study regarding viability of a conferencing center at Fort Baker); vol. 20 at FB013253 (Sedway Group market findings for Fort Baker educational and training center); vol. 15:10686–701 (Sedway Group Potential Economic Impacts of the Conference and Retreat Center alternative that summarizes the benefits of employment and visitor spending); vol. 29 at FB018645 (Sedway Group Summary of Economic Issues for Fort Baker). These economic documents do not appear to be formal or informal cost-benefit analyses. The environmental and other impacts that will result from development, however, are discussed in the Final Environmental Impact Statement and constitute an acceptable informal analysis under 40 C.F.R. § 1502.23 and *Sierra Club.*

Accordingly, the National Park Service did not act arbitrarily and capriciously in failing to append the economic analyses from the Administrative Record to the Final Environmental Impact Statement.

## C. Significant effects

■ In reviewing the adequacy of an environmental impact statement under the Administrative Procedure Act and the National Environmental Policy Act, the court's role is to ensure that the agency took a "hard look" at the environmental consequences of its decision. *Marble Mountain Audubon Society v. Rice,* 914 F.2d 179, 182 (9th Cir.1990). "An agency must set forth a reasoned explanation for its decision and cannot simply assert that its decision will have an insignificant effect on the environment." *Id.* (citing *Jones v. Gordon,* 792 F.2d 821, 828 (9th Cir.1986)). The City contends that the National Park Service violated the National Environmental Policy Act by failing to take the requisite "hard look" at the significant impacts on traffic, commercialization and protected species.

The City claims that traffic will increase on roads around Fort Baker. *See* Pl.'s Mot. for Summ. J. at 11:12–15; 27:4–6; AR, vol. 3 at FB001355. The City has pointed to no evidence regarding traffic that was not included in the Final Environmental Impact Statement to suggest that the National Park Service failed to take a hard look at the significant impact of increased traffic. In fact, the Final Environmental Impact Statement contains an extremely detailed analysis of traffic issues, including specific issues relating to downtown Sausalito. AR, vol. 3 at FB001351–1365. Further, the Final Environmental Impact Statement provides for ongoing monitoring of traffic and the establishment of a Traffic Management Plan to further protect against environmental damage by construction work. AR, vol. 3 at FB001251. Also, the Final Environmental Impact Statement envisions a

Transportation Demand Management Program to address traffic and parking concerns. AR, vol. 3 at FB001252. Although further "process" does not necessarily alleviate an agency's duty under the National Environmental Policy Act (*City of Carmel*, 123 F.3d at 1152), under the "rule of reason" standard of review, the Final Environmental Impact Statement contains a reasonably thorough discussion of the traffic consequences, showing that the National Park Service took a hard look at these issues. *Churchill County*, 276 F.3d at 1071 (quoting *Trout Unlimited*, 509 F.2d at 1283).

The City further complains that the National Park Service failed to address the precedential impact that the commercialization of Fort Baker will have on other federal lands. This argument is not persuasive. The National Park Service points out that other parks already have commercial enterprises, and Park Service regulations allow for concessions, including lodging, on federal land. 36 C.F.R. Part 51. The Final Environmental Impact Statement exhaustively examines the development of Fort Baker, including the privately-operated hotel and conference center. The City does not point to any evidence of development or commercialization that is not disclosed in the Final Environmental Impact Statement.

While over-commercialization of our national parks could undermine their mission, the City has not pointed to any evidence that the use of funds from the hotel and conference center to restore historic military buildings at Fort Baker will serve as a precedent for undue commercialization of other national parks. Fort Baker is in many respects a highly unusual national park, including its location within a major metropolitan area, and its historic military use. It is not obvious that the Fort Baker Plan sets a precedent for other, dissimilar national parks, not located in metropolitan areas or historically developed.

Further, the City's argument about over-commercialization is based on the worst case scenario, that is, a 350–room hotel. As explained above, however, the chosen hotel and conference center has only 156 rooms. Under the "rule of reason" standard of review, the Final Environmental Impact Statement contains a reasonably thorough discussion of the development and commercialization of Fort Baker. *Churchill County*, 276 F.3d at 1071 (quoting *Trout Unlimited*, 509 F.2d at 1283).

The City also contends that the National Park Service failed to adequately examine the impacts on protected species. Specifically, the City contends that the National Park Service failed to disclose the permitting process under the Marine Mammal Protection Act, failed to address the impacts on migratory birds, failed to address the effect of a parking lot on the mission blue butterfly, and failed to adequately address the effects of dredging and excavation on salmon. The City's argument is not convincing because the Final Environmental Impact Statement contains a detailed analysis of the effects of the Plan on all these sensitive species.

The National Park Service discusses marine mammals and the mitigation efforts to avoid impacts on those mammals. AR, vol. 3 at FB001249, FB001279, FB001336, FB001339, FB001341. Further, while the City believes that the Fort Baker Plan will result in a taking of marine mammals under the Marine Mammal Protection Act, thereby requiring the National Park Service to obtain a permit, the National Park Service appears to conclude that no taking will occur and therefore no permit is required. AR, vol. 3 at FB001336–FB001337.

The National Park Service also addressed the impacts on migratory birds in the Final Environmental Impact Statement and included mitigation measures to minimize those impacts. AR, vol. 3 at FB001248. While the Final Environmental Impact Statement does not specifically include the text of the Migratory Bird Treaty Act, the mitigation measures show that the National Park Service considered impacts on the birds. The City contends that the Final Environmental Impact Statement omits any discussion of the effect on migratory birds of the elimination of eucalyptus trees. The Final Environmental Impact Statement does not allow for removal of any eucalyptus trees without additional environmental analysis. Thus, the trees would not be removed based solely on this Final Environmental Impact Statement. AR, vol. 3 at FB001238. Further, the Final Environmental Impact Statement states that any removal of trees would be done in accordance with park regulations. AR, vol. 3 at FB001248. In addition, eucalyptus trees are not native to the area and serve to crowd out native habitat for the mission blue butterfly, so the City's concerns with their retention is in some tension with the City's concern for the butterflies.

 The City also states that the National Park Service did not examine the effects of the Plan on the mission blue butterfly, especially the alleged encroachment of the Bay Area Discovery Museum parking lot on the butterfly's habitat. At the June 5, 2002 hearing, the City attempted to clarify its statements in its briefs that the Museum parking lot will encroach on the mission blue butterfly habitat by presenting a series of enlarged maps of the area.[3] See Trial Exhibits 1, 3 and 4. The first map is from the 1995 environmental assessment prepared for the Fish and Wildlife Service's plan for restoration of the mission blue butterfly habitat in connection with the Golden Gate Bridge District's Retrofit Project. Tr. 39:10–15; AR, vol. 10 at FB007387. The second map is an architectural drawing from the Final Environmental Impact Statement showing the proposed museum parking lot. Tr. 45:17–21; AR, vol. 3 at FB001229. The third map reflects a full site build-out for the museum as of May 23, 2000. Tr. 53:20–23; Pl.'s Exh. 1.

The Court has carefully reviewed these maps, but cannot tell whether or not the parking lot as shown on the maps would encroach on butterfly habitat. The maps are not to scale, and the areas that the

---

3. The National Park Service contended in their briefs and at the hearing that the City is precluded from raising many of the issues they raise in this Court, including the issue of the parking lot encroachment, because the City did not raise them during the scoping process. The Court is not inclined to find that the City waived these arguments. It is true that as a general rule, issues not raised at all during a public comment period before an administrative proceeding are not considered by a reviewing court. *Marathon Oil Co. v. United States*, 807 F.2d 759, 767 (9th Cir. 1986); *Havasupai Tribe v. Robertson*, 943 F.2d 32, 34 (9th Cir.1991); *National Wildlife Federation v. EPA*, 286 F.3d 554, 562 (D.C.Cir.2002); *United States v. L.A. Tucker Truck Lines*, 344 U.S. 33, 37, 73 S.Ct. 67, 97

L.Ed. 54 (1952); *Greenpeace Action v. Franklin*, 14 F.3d 1324, 1334 (9th Cir.1992); *City & County of San Francisco v. U.S.*, 615 F.2d 498, 502 (9th Cir.1980). Here, however, all the issues were raised by some participant in the proceedings, which gave the agency an opportunity to address them in the administrative process prior to litigation. *See National Wildlife Federation*, 286 F.3d at 562 ("We decline to reach the merits of NWF's cost estimate challenges because neither NWF nor *any other party* before the agency raised any of these contentions during the administrative phase of the rulemaking process.") (emphasis added). The National Park Service's interpretation of the general rule is unnecessarily restrictive.

Court is being asked to examined are small. The National Park Service points out that the maps presented to the Court by the City are schematic drawings used to show the general location of structures on an approximate scale, as opposed to construction documents, which are precise drawings made to scale from which a project can be built. Declaration of Nancy Horner filed June 11, 2002 ("June 11, 2002 Horner Decl.") ¶¶ 6–7. By contrast, the Final Environmental Impact Statement contains definitive statements regarding preservation and restoration of the mission blue butterfly habitat. AR, vol. 3 at FB001247; AR, vol. 4 at FB002345. Further, there is specific evidence that the parking lot will not encroach. June 11, 2002 Horner Decl. ¶ 1. One of the maps that the City relies on has been superceded by later drawings. Id. ¶ 3. Ms. Horner, the National Park Service planning manager and National Environmental Policy Act project manager for the Fort Baker Plan, states that she has visited the site and determined that the parking lot will not encroach. Id. ¶¶ 14–15. Moreover, at the June 5, 2002 hearing, counsel for the Bay Area Discovery Museum stated unequivocally that "we're not going to put a parking lot in that area." Tr. 66:6–7. The Court does not presume that an officer of the court is not to be believed, absent any reliable evidence to the contrary.

Further, the National Park Service allocates a great deal of the Final Environmental Impact Statement to mission blue butterfly habitat issues. AR, vol. 3 at FB001238 (restoration of 14.25 acres of existing mission blue butterfly habitat and active restoration of 8.75 acres); FB001246–47 (mitigation measures for mission blue butterfly); FB001279;

FB001333–1334 (cumulative impacts resulting in less than significant effects); FB001340–1341. The Fish and Wildlife Service has stated that the Fort Baker Plan will not jeopardize the continued existence of the mission blue butterfly. AR, vol. 4 at FB002350. In addition, the Final Environmental Impact Statement proposes monitoring for the mission blue butterfly. AR, vol. 3 at FB001247. Under the "rule of reason" standard of review, the Final Environmental Impact Statement contains a reasonably thorough discussion of the impacts on the mission blue butterfly and the mitigation efforts.

The City also complains that the National Park Service did not take a hard look at the effects of dredging on salmon. The City relies on a declaration from William Kier, a fisheries ecologist, to show that the dredging will effect salmonids, even though the Final Environmental Impact Statement states that it will not.[4] Declaration of William Kier ("Kier Decl.") ¶¶ 7–8; AR, vol. 3 at FB001337. The evidence submitted by the National Park Service with its summary judgment motion regarding dredging and its effect on salmon in Horseshoe Bay initially appeared to indicate that the June through September window would partially coincide with juvenile chinook salmon migration. Declaration of Darren Fong ("Fong Decl.") at ¶¶ 6–7.

More specific supplemental evidence requested by the Court, however, shows that endangered or threatened salmonid are unlikely to be present in Horseshoe Bay from June through September. Supplemental Declaration of Darren Fong ("Supp. Fong Decl.") at ¶ 5. Mr. Fong, an experienced aquatic ecologist with the Golden Gate National Recreation Area who has actively worked with salmonid

---

4. The National Park Service's motion to strike Mr. Kier's declaration is denied. In addition, the Court grants the National Park Service's request to consider the declarations of Darren Fong and Gary Stern.

resources, testified that during the California Department of Fish and Game's eight-year program studying fish in Horseshoe Bay, only ten juvenile chinook salmon were caught, three of which were caught in the month of June. *Id.* at ¶ 3. These juvenile chinook were unlikely to be spring-run or winter-run chinook, both of which are listed under the Endangered Species Act. *Id.* at ¶ 4. More likely, these were fall-run chinook, which are not listed as endangered or threatened under the Endangered Species Act. *Id.* at ¶ 4. Similarly, Mr. Stern, an experienced fishery biologist with the National Marine Fisheries Service who has been involved in many projects affecting salmon conducted in the San Francisco Bay, testified that even though there may be one fish from a represented category of protected fish in the bay at any time, there are distinct migration periods that dredging in June through September would avoid. Declaration of Gary Stern ("Stern Decl.") ¶ 4.

The National Park Service took great care in the Final Environmental Impact Statement to avoid impacts on marine life, such as salmon. The Record of Decision adopts sixteen pages of mitigation measures, including those regarding the mission blue butterfly and salmon.[5] AR, vol. 2 at FB001879–FB001894 (Appendix A of the Record of Decision). Thus, the Final Environmental Impact Statement contains a reasonably thorough discussion of the impacts on marine life and the mitigation efforts.

### D. Scientific evidence

 All scientific methodologies used in an environmental impact statement must be explicitly referenced by footnote to the scientific and other sources relied upon for conclusions in the environmental impact statement. 40 C.F.R. § 1502.24. The City contends that the National Park Service violated the National Environmental Policy Act by failing to support with scientific evidence its conclusions that developing Horseshoe Bay will not have serious impacts on protected species such as salmon and marine mammals, that toxic chemicals will have a less than significant impact on marine life, and that the Plan will have only a minor effect on birds and bats.

While the National Park Service did not include the scientific sources in footnotes throughout the Final Environmental Impact Statement, the sources are specifically set forth in an index at the end of the Final Environmental Impact Statement. AR, vol. 3 at FB01439–FB001449. Further, throughout the Final Environmental Impact Statement, the National Park Service cites its sources in parantheticals. *See, e.g.,* AR, vol. 3 at FB001267, FB001271, FB001276, FB001277, FB001324, FB001332. This is sufficient.

### E. Cumulative impacts

An agency must include connected actions and cumulative actions in an envi-

---

5. The City argued at the June 5, 2002 hearing that the mitigation measures adopted by the Record of Decision are insufficient, vague and ambiguous "to the extreme." Tr. 83:18–19. The National Environmental Policy Act, however, does not require a fully developed plan that will mitigate all environmental harm before an agency can act; rather, the Act requires that mitigation be discussed in sufficient detail to ensure that environmental consequences have been fully evaluated.

*Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 352–53, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989); *National Parks & Conservation Ass'n v. U.S. Dep't of Transp.,* 222 F.3d 677, 681–82 (9th Cir.2000); *Laguna Greenbelt,* 42 F.3d at 528. Here, the National Park Service satisfied its burden of sufficiently discussing mitigation measures to ensure that environmental consequences have been fully evaluated.

ronmental impact statement. 40 C.F.R. § 1508.25(a). Connected actions are those which automatically trigger other actions that may require environmental analysis, which cannot or will not proceed unless other actions are taken previously or simultaneously, or which are interdependent parts of a larger action. 40 C.F.R. § 1508.25(a)(1). Cumulative actions are those which, when viewed with other proposed actions, have cumulatively significant impacts and should therefore be discussed in the same impact statement. 40 C.F.R. § 1508.25(a)(2). This issue usually arises where there are large-scale development plans for which the National Environmental Policy Act requires both a programmatic and a site-specific environmental impact statement: "where several foreseeable similar projects in a geographic region have a cumulative impact, they should be evaluated in one environmental impact statement." *Sierra Club v. United States*, 23 F.Supp.2d 1132, 1141 (N.D.Cal. 1998).

■ The City contends that the National Park Service failed to consider cumulative impacts in the Final Environmental Impact Statement. Specifically, the City complains that the development of parking lots and buildings will require removal of eucalyptus trees, which will harm birds, and that the Final Environmental Impact Statement defers discussion of the environmental impacts of that removal. AR, vol. 3 at FB001238. This situation, however, is unlike a traditional cumulative impact challenge where, for instance, the agency erred by failing to consider a forest-wise harvesting plan in an environmental impact statement for a site-specific timber harvesting program. *City of Tenakee Springs v. Clough*, 915 F.2d 1308, 1312 (9th Cir.1990). Moreover, the National Park Service counters that development is not dependent on the removal of the trees,

but that removal of nine acres of eucalyptus trees will result in six acres of new mission blue butterfly habitat. AR, vol. 4 at FB002340. Therefore, removal of the trees is a separate action which need not be included in this Final Environmental Impact Statement.

■ Further, although additional analyses will be completed later, the National Park Service did consider the removal of the trees in this Final Environmental Impact Statement. AR, vol. 3, FB001318 (removal of trees considered as part of total land disturbance); vol. 3 at FB001335 (showing area for removal of trees), vol. 3 at FB001338 (removal of non-native trees would be beneficial). In addition, the National Park Service analyzed the cumulative effects of a restoration project aimed at controlling the spread of non-native plants that are harmful to the mission blue butterfly. The National Park Service concluded that, individually, the Fort Baker Plan would have a less-than-significant impact on the mission blue butterfly, and that, in combination with the restoration project, there would be a beneficial effect on the mission blue butterfly. AR, vol. 3 at FB001342. The Final Environmental Impact Statement's discussion of the removal of trees is sufficient.

**F. Biological Opinion**

■ The City claims that the Final Environmental Impact Statement fails to reference, incorporate or make public the biological opinions of the Fish and Wildlife Service and the National Marine Fisheries Service on which the Final Environmental Impact Statement rests its conclusions that the Plan would not jeopardize protected species. The City contends that this alleged omission violates the National Environmental Policy Act.

During the National Environmental Policy Act process, the National Park Service

consulted with the National Marine Fisheries Service. In September 1997, the National Marine Fisheries Service issued a letter to the National Park Service listing the protected species, including several salmonid species, in the proposed project area. AR, vol. 4, FB002298. In October 1998, the National Marine Fisheries Service issued another letter commenting on the Draft Environmental Impact Statement and recommending a number of mitigation measures to be considered to protect the sensitive species. AR, vol. 4 at FB002307. In that letter, the National Marine Fisheries Service stated:

> If the National Park Service modifies the Fort Baker conversion project with these recommendations and then determines that the action is not likely to adversely affect listed species or critical habitat, *this letter will constitute a written concurrence that the proposed action is not likely to adversely affect listed species or critical habitat* pursuant to 50 C.F.R. § 402.13(b).

*Id.* (emphasis added). The mitigation measures recommended by National Marine Fisheries Service were included in the Final Environmental Impact Statement. AR, vol. 3 at FB001246, FB001248, FB001250. As permitted by the Endangered Species Act, the National Marine Fisheries Service did not issue a biological opinion. Contrary to the City's argument that the opinion of National Marine Fisheries Service is not included in the Final Environmental Impact Statement, this letter is reprinted in its entirety in the Final Environmental Impact Statement. AR, vol. 3 at FB001499.

The National Park Service also consulted with the Fish and Wildlife Service, and the Fish and Wildlife Service issued a biological opinion. The opinion is referenced in the Final Environmental Impact Statement (AR, vol. 3 at FB001331–1332)

and the mitigation measures reflect that the Fish and Wildlife Service's terms and conditions were incorporated into the Final Environmental Impact Statement (AR, vol. 3 at FB001247), although the actual biological opinion is not appended to the Final Environmental Impact Statement. The City, however, has provided no specific authority for its claim that the actual biological opinion must be appended to the Final Environmental Impact Statement. In short, the Final Environmental Impact Statement reflects that the National Park Service took a hard look at the Fish and Wildlife Service's opinion and incorporated its recommendations.

In conclusion, the City has not shown any violations of the National Environmental Policy Act under the applicable "rule of reason" standard of review.

## VI. ENDANGERED SPECIES ACT

Substantively, the Endangered Species Act prohibits the taking of endangered species. 16 U.S.C. § 1538. Section 7 of the Endangered Species Act, 16 U.S.C. § 1536(a)(2), requires the Secretary to ensure that an agency action is not likely to jeopardize the continued existence of any threatened or endangered species. Violation of this section is reviewable under the Administrative Procedure Act's arbitrary and capricious standard. *Bennett v. Spear*, 520 U.S. 154, 175–179, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997); *see also Village of False Pass v. Clark*, 733 F.2d 605, 609–10 (9th Cir.1984).

The Endangered Species Act sets out a three-step consultation process to ensure compliance with this substantive provision of the Act whereby the agency with jurisdiction over the species evaluates the nature and extent of jeopardy to the species. First, an agency proposing to take an action must inquire of the Service with jurisdiction over the species (e.g., Fish and

Wildlife Service or National Marine Fisheries Service) whether any threatened or endangered species are present in the area of the proposed action. *Thomas v. Peterson,* 753 F.2d 754, 763 (9th Cir.1985); 16 U.S.C. § 1536(c)(1). If the answer is affirmative, the agency proposing to take the action must prepare a biological assessment to determine whether the species is likely to be affected by the action. *Thomas,* 753 F.2d at 763; 16 U.S.C. § 1536(c)(1). The biological assessment may be part of an environmental impact statement. *Thomas,* 753 F.2d at 763; 16 U.S.C. § 1536(c)(1).

If, and only if, the agency determines, based on the biological assessment, that the proposed action is likely to affect a threatened or endangered species, formal consultation is required. In the formal consultation process, the agency must provide the relevant Service with "the best scientific and commercial data available or which can be obtained during the consultation for an adequate review of the effects that an action may have on listed species." 50 C.F.R. § 402.14(a), (c). Formal consultation results in a biological opinion from the Service expressing the Service's conclusion as to whether the action would jeopardize the protected species. *Thomas,* 753 F.2d at 763. If the biological opinion concludes that the proposed action would jeopardize the species or adversely affect critical habitat, then the proposed action may not go forward unless the Service can suggest an alternative to avoid the adverse impact. *Thomas,* 753 F.2d at 763; 16 U.S.C. § 1536(b)(3)(A). If the biological opinion concludes that the proposed action

will not violate the Act, the Service may still require mitigation measures. *Thomas,* 753 F.2d at 763; 16 U.S.C. § 1536(b)(4)(ii)-(iii).

By contrast, if the federal agency determines instead that the proposed action would not likely adversely affect a protected species, it may attempt informal consultation. In the informal consultation process, the Service must issue a written concurrence with the agency's determination of no likely adverse effect, or may suggest modifications that the agency proposing the action could take to avoid adverse effects. 50 C.F.R. § 402.13(a). If the Service does not concur, formal consultation (resulting in a biological opinion) is required. 50 C.F.R. § 402.14; *see also Pacific Coast Federation of Fishermen's Ass'ns v. U.S. Bureau of Reclamation,* 138 F.Supp.2d 1228, 1240–42 (N.D.Cal.2001) (providing a detailed discussion of the requirements of the Endangered Species Act).

### A. Preparation of a Biological Assessment

The City contends that the National Park Service failed to prepare a biological assessment after learning from the Fish and Wildlife Service and the National Marine Fisheries Service that threatened or endangered species were within the project area. Further, the City argues that even if a biological assessment were prepared, the National Marine Fisheries Service omitted four salmonid stocks that should have been included in the list of protected species.[6]

---

**6.** The City's argument that the Draft Environmental Impact Statement was insufficient as a biological assessment appears to have its origin in the Kier declaration, which lists additional salmonid stocks that are not listed on the first National Marine Fisheries Service list of protected species. *See* Kier Decl. ¶ 3.

An initial letter from the National Marine Fisheries Service included only three salmonid species that would be within the project area. AR, vol. 4 at FB002298. Later, the National Marine Fisheries Service issued a second letter including four additional species. AR, vol. 4 at FB002307. Because the

By virtue of its nature as a tool to facilitate the Endangered Species Act process, a complete failure to conduct a biological assessment when required is subject to judicial review, but the contents of an assessment are not. *See, e.g., City of San Diego v. Whitman,* 242 F.3d 1097, 1101–02 (9th Cir.2001); *see also Defenders of Wildlife v. Babbitt,* 130 F.Supp.2d 121, 126, n. 4 (D.D.C.2001). The contents of a biological assessment are at the discretion of the agency, and may include results of an on-site inspection, views of recognized experts on the species, review of the relevant literature, analysis of the effects of the action on the species and habitat and an analysis of alternative actions. 50 C.F.R. § 402.12(f). The purpose of the assessment is to "evaluate the potential effects of the action on listed and proposed species and designated and proposed critical habitat and determine whether any such species or habitat are likely to be adversely affected by the action...." 50 C.F.R. § 402.12(a). A biological assessment may be part of an environmental impact statement. *Thomas,* 753 F.2d at 763; 16 U.S.C. § 1536(c)(1).

■ Here, the National Park Service received lists of protected species in the Fort Baker development area from the National Marine Fisheries Service and the Fish and Wildlife Service. AR, vol. 4, FB002294; FB002298; FB002315; FB002320. The National Park Service requested an updated list from the National Marine Fisheries Service (AR, vol. 4 at FB002301), which was provided in October

1998. AR, vol. 4 at FB002307. The National Marine Fisheries Service's October 1998 letter included additional species as well as mitigation measures that it proposed be included in the Final Environmental Impact Statement. The National Marine Fisheries Service stated that if the National Park Service included the mitigation measures and found that the Plan would not adversely affect the species, then the letter would constitute written concurrence from the National Marine Fisheries Service, concluding the consultation.

Based on the list from the Fish and Wildlife Service, the National Park Service determined that the mission blue butterfly was the only protected species that might be adversely affected by the Plan. AR, vol. 4 at FB002337. The Fish and Wildlife Service then issued a biological opinion concluding that the Plan would not likely jeopardize the existence of the mission blue butterfly. AR, vol. 4 at FB002350. The Fish and Wildlife Service required mitigation measures, all of which were included in the Final Environmental Impact Statement. Consultation ended with the biological opinion and inclusion of the mitigation measures in the Final Environmental Impact Statement.

After the National Park Service received information from the Fish and Wildlife Service and the National Marine Fisheries Service regarding protected species within the area, the National Park Service prepared the Draft Environmental Impact Statement. The National Park Service

National Park Service received the second letter after it drafted the Draft Environmental Impact Statement, the additional species were not included in the Draft Environmental Impact Statement. The National Marine Fisheries Service did not request a biological assessment of the effects on the additional species, but recommended additional mitigation measures that, if included in the Final

Environmental Impact Statement, would satisfy the Service. *Id.* Although the National Park Service did not have the benefit of an updated list of salmon species when it prepared the Draft Environmental Impact Statement, it included the mitigation measures recommended by the National Marine Fisheries Service in the Final Environmental Impact Statement.

contends that the Draft Environmental Impact Statement served as a biological assessment. The Draft Environmental Impact Statement contains the elements of a biological assessment in which the effects on salmon are examined. AR, vol. 2 at FB000742. The Draft Environmental Impact Statement acknowledges that adverse affects on shallow water habitat will occur, affecting fish, including salmon. AR, vol. 2 at FB000868. Dredging and bulkhead removal, however, will take place outside of the peak migration season for fish. *Id.* Further, before in-water construction takes place, the National Park Service must comply with permit requirements which would further mitigate damages. *Id.* The Statement's assessment that salmon would be adversely affected, but the effect would be minimized, is not arbitrary or capricious. It is unfortunate that the National Park Service did not have the benefit of the additional four salmonid stocks listed by the National Marine Fisheries Service' second letter and by Mr. Kier in preparing its assessment in the Draft Environmental Impact Statement. The National Park Service provided in the Draft Environmental Impact Statement, however, that a biologist would be on hand if construction were near a protected species' habitat (AR, vol. 2 at FB000790), and the National Park Service examined the effects on at least some salmon stocks (AR, vol. 4 at FB000818). It also adopted all recommended mitigation measures in the Final Environmental Impact Statement.

The National Park Service complied with the requirement to prepare a biological assessment by preparing the Draft Environmental Impact Statement, especially in light of the fact that there are no specific requirements for the contents of a biological assessment. In a perfect world, the Draft Environmental Impact Statement could have contained more analysis on the effect on salmon. That finding, however, does not support a determination that the National Park Service acted arbitrarily and capriciously.

### B. Use of the Best Scientific and Commercial Data Available

During the formal consultation process, the agency must provide the Service with "the best scientific and commercial data available," including any relevant studies or surveys. 50 C.F.R. § 402.14(d); *Conner v. Burford,* 848 F.2d 1441, 1454 (9th Cir.1988). In *Conner,* the court held that the government violated the Endangered Species Act because the biological opinion only discussed the effects of granting leases, but not the impact of post-leasing activities, which could harm protected species. *Conner,* 848 F.2d at 1453–54; *see also Bob Marshall Alliance v. Hodel,* 852 F.2d 1223, 1228 (9th Cir.1988). By contrast, here, the biological opinion by the Fish and Wildlife Service analyzed the effects of the entire Fort Baker Plan and its aftermath on the mission blue butterfly. AR, vol. 4 at FB002344 (addressing ongoing annual reports and monitoring, etc.); FB002349 (impact on mission blue butterfly from construction of conference center as well as from future operations and maintenance).

The City contends that the Fish and Wildlife Service ignored available scientific and commercial data showing encroachment of the Bay Area Discovery Museum parking lot on the mission blue butterfly habitat. As explained above, however, the City has failed to prove an encroachment.

The City also argues that the National Park Service failed to provide the National Marine Fisheries Service with the best scientific data regarding the effects on salmonids as outlined by Mr. Kier. But the National Marine Fisheries Service consul-

tation did not get to the formal stage that would have triggered the requirement to provide the best available data. Furthermore, when the National Park Service sought an updated list of protected species, the National Park Service addressed the general outline of the Plan. The National Marine Fisheries Service also had the Draft Environmental Impact Statement when it determined that, even with the additional species, the Plan would not likely jeopardize the salmon if the National Park Service adopted the recommended mitigation measures.

The City argues that the Fish and Wildlife Service and the National Marine Fisheries Service "uncritically concurred" with the National Park Service' analysis of no impact. This does not accurately characterize the two Services' involvement. Each actively participated in the process and issued their opinions.

The City relies on *Resources Limited, Inc. v. Robertson*, 35 F.3d 1300 (9th Cir. 1993) for its conclusion that the National Park Service violated the Endangered Species Act. In *Resources Limited*, a Forest Service study raised serious questions about the effects of certain timber harvest levels on the endangered grizzly bear, but the Forest Service did not provide the study to the Fish and Wildlife Service. The Fish and Wildlife Service concluded that timber harvesting would not likely jeopardize any listed species. The Forest Service relied on that opinion to find no jeopardy. The court held that the Forest Service's reliance on the opinion was arbitrary and capricious in light of its failure to provide the study to the Fish and Wildlife Service. *Resources Limited*, 35 F.3d at 1305.

Here, by contrast, the City has not pointed to any material evidence within the National Park Service's control that the National Park Service kept from the National Marine Fisheries Service or the Fish and Wildlife Service before those Services issued their opinions. The City argues that the information regarding migration of salmon included in the Kier declaration was available to the National Park Service, but was not provided to the National Marine Fisheries Service. But the City does not show that the National Park Service actually had the information and failed to disclose it to the National Marine Fisheries Service. Further, the National Park Service points to scientific evidence that it used in conducting the analysis that forms the basis for the discussion of the mission blue butterfly in the Draft Environmental Impact Statement. *See* Defs.' Opp'n to Pl.'s Mot. for Summ. J. at 17:7–11. In addition, the Fish and Wildlife Service considered extensive scientific data. *See* Fish and Wildlife Service Administrative Record at 120–538. The National Park Service also considered extensive scientific evidence with regard to the salmon issues. *See* Defs.' Opp'n to Pl.'s Mot. for Summ. J. at 17:14–18:2. Accordingly, the National Park Service did not act arbitrarily or capriciously in its decisions under the Endangered Species Act.

## VII. NATIONAL PARK SERVICE ORGANIC ACT

Under the Organic Act, the National Park Service:

> shall promote and regulate ... national parks ... by such means and measures as conform to the fundamental purpose of the said parks ... which purpose is to conserve the scenery and the natural and historic objects ... therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations.

16 U.S.C. § 1. Congress created the Golden Gate National Recreation Area to "pre-

serve the recreation area, as far as possible, in its natural setting and protect it from development and uses which would destroy the scenic beauty and natural character of the area." 16 U.S.C. § 460bb. Under this enabling legislation, resources of the Golden Gate National Recreation Area shall be used in a manner "which will provide for recreation and educational opportunities consistent with sound principles of land use planning and management." *Id.* The Fort Baker Plan provides for recreational and educational opportunities at the Bay Area Discovery Museum and the conference center, for restoration of waterfront areas and native vegetation and for protection of mission blue butterfly habitat, as well as rehabilitation of historic buildings. The City contends, however, that development of Fort Baker directly contravenes the purpose of Fort Baker as stated in the Organic Act and would "obliterate" Fort Baker's scenic beauty.

The Organic Act expressly delegates rulemaking authority to the Secretary of the Interior. *See Bicycle Trails Council of Marin v. Babbitt,* 82 F.3d 1445, 1451 (9th Cir.1996). Legislative regulations promulgated pursuant to such express authority will be upheld " 'unless they are arbitrary, capricious or manifestly contrary to the statute.' " *Bicycle Trails,* 82 F.3d at 1451 (quoting *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)).

Judicial review under the *Chevron* test is a two-step process:

First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress

has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Chevron,* 467 U.S. at 842–43, 104 S.Ct. 2778; *see also Bicycle Trails,* 82 F.3d at 1452 (noting that the Organic Act's silence as to the specifics of park management gives the Park Service broad discretion in determining how best to achieve the Act's mandate, and resolving an issue under the Organic Act and the Golden Gate National Recreation Area legislation at step two of the *Chevron* test).

Here, Congress does not specifically address commercialization in the Organic Act or the Golden Gate National Recreation Area enabling legislation, except to the extent that uses of the Golden Gate National Recreation Area should not destroy its beauty, but should promote education and recreation. The National Park Service has broad discretion in determining how to meet these general goals. There is no showing that the Plan will eliminate the area's beauty. Indeed, the Plan's restoration of natural habitat and rehabilitation of dilapidated buildings will enhance that beauty, while the expanded Bay Area Discovery Museum and newly renovated waterfront and marina, as well as improved hiking and bicycling trails, will improve the public's opportunities for education and recreational enjoyment of this beautiful setting. The hotel and conference center, if kept more modest in size as currently planned and designed and operated with sensitivity to its lovely surroundings, should not, by itself, negate these improvements. Under step two of

the *Chevron* test, the Fort Baker Plan constitutes a reasoned exercise of discretion by the National Park Service under the two Acts.

## VIII. CONCLUSION

Defendants' Motion for Summary Judgment (docket number 48) is granted. Plaintiff's Motion for Summary Judgment (docket number 44) is denied. This Order also resolves Defendants' Motion to Strike Dana Whitson's declaration (docket number 73) and Defendants' Motion to Strike William Kier's declaration (docket number 65).

IT IS SO ORDERED.